HANS H. OLSON v. STATE BANK and Others.[1]

January 19, 1897.

Nos. 10,320—(99).

**Bank—Issue of Stock—Ultra Vires—Rescission by Stockholders.**

*Held*, following Dunn v. State Bank, 59 Minn. 221: (1) That where the stockholders of a banking corporation voted to increase its stock, having authority to do so under the articles of association, and part of such stock was purchased by its president, who was also city treasurer, and paid for with city funds. unlawfully used by him for that purpose, and the stock then sold by him to third parties, the stock was not ultra vires and void, but at most only voidable; (2) that, in view of the lapse of time after the stock was issued before the bank failed, the want of diligence on part of the holders in not sooner discovering the insolvency of the bank, and the large amount of corporate indebtedness still outstanding which has been incurred since the stock was issued, the holders of the stock have no right to rescind, as against creditors whose rights have become vested by the insolvency of the bank.

Appeal by defendants Manley and others from an order of the district court for Hennepin county, Belden, J., denying a motion for a new trial. Affirmed.

*J. D. Emery, J. O. Pierce, C. H. Slack,* and *C. E. Vanderburgh,* for appellants.

None of the appellants were in fact or law holders of stock in the bank, because the proposed increase of stock was never legally made. The statute provides that no increase of capital shall be valid until the whole amount of the increase is paid in cash. Such payment must be certified by the proper officer. G. S. 1894, § 2498. There is a similar provision in the national bank act. Rev. St. § 5142. The statutory requirement not having been complied with, the proposed increase in this case was invalid. There is no question here of waiver or of ratification. The sole question is the failure of the bank to observe a statutory requirement, a failure which rendered the increase of stock void. Scovill v. Thayer, 105 U. S. 143; Handley v. Stutz, 139 U. S. 417, 11 Sup. Ct. 530; Page v. Austin, 10 Canada S. C. 132; Schierenberg v. Stephens, 32 Mo. App. 314; American T. Works v. Boston M.

1 Reported in 69 N. W. 904.

Co., 139 Mass. 5, 29 N. E. 63; Winters v. Armstrong, 37 Fed. 508; Delano v. Butler, 118 U. S. 634, 7 Sup. Ct. 39; Lincoln v. Express Co., 45 La. An. 729, 12 South. 937; Kampman v. Tarver, 87 Texas, 491, 29 S. W. 768; Bank v. Alison, L. R. 6 C. P. 54, 222; Stace and Worth's Case, L. R. 4 Ch. Ap. 682; New York & N. H. R. Co. v. Schuyler, 34 N. Y. 30; Charleston v. Bank, 5 Rich. (S. C.) 103; Aspinwall v. Butler, 133 U. S. 595, 10 Sup. Ct. 417; Clark v. Turner, 73 Ga. 1; Grangers' L. & H. Ins. Co. v. Kamper, 73 Ala. 325; Cartwright v. Dickinson, 88 Tenn. 477, 12 S. W. 1030; Steamboat Co. v. Sewall, 78 Me. 167, 3 Atl. 181; Brand v. Lawrenceville B. R. R. Co., 77 Ga. 506, 1 S. E. 255.

The bank received only $3,000 for this issue of 250 new shares. Kortgaard's fraudulent use of city funds did not constitute a valid payment, but was a sham payment. Crawford v. Rohrer, 59 Md. 604. See Atlantic Cotton Mills v. Indian Orchard Mills, 147 Mass. 268, 17 N. E. 496; Eaton v. Bank, 144 Mass. 260, 10 N. E. 844; American T. Works v. Boston M. Co., supra. The bank had express notice that the funds were trust funds, checks being signed by Kortgaard as city treasurer. Marbury v. Ehlen, 72 Md. 206, 19 Atl. 648; Shaw v. Spencer, 100 Mass. 382. The bank therefore became a trustee for and liable to the city. There was no increase of stock, because the essential condition of payment was lacking.

There can be no estoppel in a case like this. It is public policy that statutory requirements of the bank law be complied with literally. If these requirements are disregarded, they cannot be made valid upon the principle of estoppel. 1 Lindley, Partn. 134; Veeder v. Mudgett, 95 N. Y. 295; Banigan v. Bard, 134 U. S. 291, 10 Sup. Ct. 565.

The bank could not hold these appellants as holders of the new stock. The acts of Kortgaard were the acts of the bank. The bank, having left the sole management to him, is bound by his acts. The bank is liable for any wrong done by its issue of stock certificates. New York & N. H. R. Co. v. Schuyler, 34 N. Y. 30, 49, 50, 64; Bruff v. Mali, 36 N. Y. 200; Titus v. Turnpike Road, 61 N. Y. 237; Fishkill Savings Inst. v. National Bank of Fishkill, 80 N. Y. 162; Allen v. South Boston R. Co., 150 Mass. 200, 22 N. E. 917.

*John B. Arctander*, for respondent.

Scovill v. Thayer, 105 U. S. 143, 149, clearly distinguishes the case where a bank has no right to increase its capital, and one where it has

the power, though not in the manner which was followed. Under the Minnesota statute, the proviso of G. S. 1894, § 2498, is in the nature of a condition subsequent. The increase is first to be voted and then the stock is to be paid for as issued. The language is that "No such increase shall be valid unless paid in full." These words may mean "absolutely void," but they may mean "voidable." A voidable contract is not valid, as well as one which is absolutely void.

On the facts this case is stronger against the stockholders than that of Dunn v. State Bank, 59 Minn. 221, 61 N. W. 27.

After bankruptcy a stockholder cannot bring an action to rescind. The American doctrine that the capital stock of the corporation is a trust fund for creditors would prevent any diminution of such fund after the act of insolvency. Farnsworth v. Robbins, 36 Minn. 369, 31 N. W. 349; Sanger v. Upton, 91 U. S. 56; Sawyer v. Hoag, 17 Wall. 610; Clapp v. Peterson, 104 Ill. 26; Crandall v. Lincoln, 52 Conn. 73; Adler v. Milwaukee P. B. Mfg. Co., 13 Wis. 57; Vick v. La Rochelle, 57 Miss. 602; Chouteau Ins. Co. v. Floyd, 74 Mo. 286; Gill v. Balis, 72 Mo. 424; Upton v. Tribilcock, 91 U. S. 45; Brant v. Ehlen, 59 Md. 1; Beach, Priv. Corp. 213, 223; Scovill v. Thayer, supra; Kehlor v. Lademann, 11 Mo. App. 550; Hatch v. Dana, 101 U. S. 205; Pullman v. Upton, 96 U. S. 328; Hawley v. Upton, 102 U. S. 314; Flinn v. Bagley, 7 Fed. 785; Sturges v. Stetson, 1 Biss. 246, Fed. Cas. No. 13,568; Great Western Tel. Co. v. Gray, 122 Ill. 630, 14 N. E. 214; Crawford v. Rohrer, 59 Md. 599; Pittsburg & C. Ry. Co. v. Stewart, 41 Pa. St. 54; Peoria & S. Ry. Co. v. Thompson, 103 Ill. 187; Stein v. Howard, 65 Cal. 616, 4 Pac. 662; New Castle H. Ry. Co. v. Simpson, 21 Fed. 533; Spurlock v. Missouri P. Ry. Co., 90 Mo. 199, 2 S. W. 219; Harrison v. Arkansas V. Ry. Co., 4 McCrary, 264, 13 Fed. 522; Fosdick v. Sturges, 1 Biss. 255, Fed. Cas. No. 4,956; Fisk v. Chicago, R. I. & P. Ry. Co., 53 Barb. 513; O'Brien v. Chicago, R. I. & P. Ry. Co., 53 Barb. 568; Mann v. Cooke, 20 Conn. 178; Neuse River Nav. Co. v. Commrs. of Newbern, 7 Jones L. 275; Osgood v. King, 42 Iowa, 478; Beach, Priv. Corp. 232; Bissell v. Heath, 98 Mich. 472, 57 N. W. 585.

The English rule denies a shareholder, after the company has become insolvent, the right to repudiate his liability on the ground of fraud. Henderson v. Royal B. Bank, 7 El. & Bl. 356; Dossett v. Harding, 1 C. B. (N. S.) 524; Powis v. Harding, 1 C. B. (N. S.) 533; Daniell v. Royal Brit. Bank, 1 H. & N. 681; Oakes v. Turquand, L. R. 2 Eng. & Ir.

Ap. 325; Stone v. City Bank, 3 C. P. Div. 282; Kingsford v. Merry, 11 Exch. 577; Wright's Case, L. R. 7 Ch. App. 55, 60; Pugh & Sharman's Case, L. R. 13 Eq. 566. These English decisions have been generally followed in this country. Ogilvie v. Knox Ins. Co., 22 How. 380; Upton v. Tribilcock, supra; Chubb v. Upton, 95 U. S. 667; Payson v. Withers, 5 Biss. 269, Fed. Cas. No. 10,864.

MITCHELL, J. This action was brought by the plaintiff, in behalf of himself and all other creditors of the defendant bank, to enforce the liability of stockholders for corporate debts. The defenses interposed by the appellant defendants were, substantially, that (1) they were induced to purchase the stock by false and fraudulent representations which entitled them to rescind; (2) the stock, being illegally issued, was absolutely void and never had any legal existence as stock. The court held defendants liable as stockholders, and ordered judgment accordingly; and the only question presented by this appeal is whether the findings of fact justified this conclusion of law.

So far as here material, the findings are substantially as follows: The defendant bank was organized as a banking corporation under chapter 33 of the General Statutes,[2] with a paid-up capital of $75,000, but with authority under its articles of association to increase it, by a majority vote of its shareholders, to $500,000. In July, 1892, the stockholders duly voted to increase the capital stock to $100,000 by the issue of 250 additional shares of $100 each. Ten shares of this increased stock were subscribed for by defendant Nelson Williams, 5 shares by defendant Mrs. Williams, 15 shares by other persons not parties to this appeal, and the remaining 220 shares by Kristian Kortgaard. On August 10, 1892, the cashier of the bank certified under oath to the public examiner of banks to the payment in cash of the $25,000 increase, and on August 12 the public examiner issued his certificate certifying that the bank had complied with all the provisions of law in regard to such increase of stock, and that the $25,000 had been paid in as part of the capital of the bank, and approving of such increase.

Certificates for this increased stock were issued to the persons assumed to be entitled to the same. Neither the bank nor the sub-

[2] G. S. 1894, §§ 2490–2532.

scribers seem to have awaited the official action of the bank examiner, for the stock certificates were issued to Mr. Williams August 3, to Mrs. Williams August 6, and to Kortgaard August 10. Of this increased stock issued to Kortgaard, he sold and transferred certain shares, August 15, to defendant Woodward; August 19, to defendant Brown; December 5, to one Snyder, who on December 8 assigned to defendants C. H. Chadbourn & Sons; December 8, to defendant Nowell; December 15, to defendant Sanborn; December 15, to defendant Manley; January 6, 1893, to defendant Jenks; February 4, to defendant Mrs. Williams. All of these transfers were made on the books of the bank, and new certificates issued to the transferees in place of those issued to Kortgaard.

During all this time Kortgaard was the president of the bank, and its virtual manager, without any direct or active supervision of its affairs on part of the board of directors, who left everything solely to him. He was also treasurer of the city of Minneapolis, and had deposited to his credit as such treasurer in other banks large sums of city funds. He represented to the Williamses, when they subscribed and paid for their stock, that the bank was sound and prosperous, and that its stock was a good and desirable investment, and then worth more than par. He made the same representations to the other defendants, to whom he sold portions of his own stock, and each and all of the defendants purchased the stock in reliance on these representations.

The court finds that it does not appear, from the evidence, that such representations were made with the consent, knowledge, or connivance of either the stockholders or directors, or that they ever authorized him to make them, or that they ratified them, except as such authority may be inferred from the fact that the stockholders passed a resolution authorizing the president and cashier of the bank to offer the increased stock for sale, and to issue certificates therefor. It does not appear that the bank ever received any of the money paid to Kortgaard for the stock sold by him.

The representations made by Kortgaard as to the condition of the bank and the value of its stock were wholly false. As a matter of fact, at the time the increased stock was voted and ever afterwards, the bank was, on account of the embezzlement and fraudulent misappropriations of its funds by Kortgaard, utterly and hopelessly in-

solvent; over $375,000 of its nominal assets consisting of worthless notes of corporations which Kortgaard had organized for the express purpose of enabling him to borrow large amounts of money from the bank. These facts, however, were unknown to the other stockholders and directors, who voted for the increase of stock in good faith, on Kortgaard's representations that the bank was prosperous, and that the increase was required to meet the increase of its business. None of the defendant stockholders had notice or knowledge of any fact tending to excite suspicion as to the true condition of the bank, until its failure in June, 1893. But neither at the time they purchased their stock, nor at any time before the failure of the bank, did they make any examination or inspection of its books or records in order to ascertain its condition, or ever request the privilege of doing so. Had they made such investigation and examination, they would have discovered facts reasonably tending to show the true condition of the bank, and that it was utterly insolvent.

All of the defendants, except Jenks and Mrs. Williams (as to the five shares purchased from Kortgaard), received dividends on their stock. No question is made but that Mr. and Mrs. Williams paid in full with their own money for the stock, which they purchased directly from the bank. Kortgaard, in payment of the 220 shares increased stock issued to him, drew checks, signed by him as city treasurer, payable to the defendant bank, on the banks in which the city funds were deposited, for the aggregate amount of $22,000. These checks were presented through the clearing house to the banks on which they were drawn and by them paid, and the money represented by them received by the defendant bank, and converted to its own use. For the remaining $440 (the stock having been subscribed for at 2 per cent. premium) Kortgaard gave his own personal check on the defendant bank, where his account was already overdrawn.

None of the officers or stockholders of the bank, other than Kortgaard himself, knew that he had paid for his stock with city funds. Neither was it known to any of the defendants until it was discovered by an expert after the bank failed, nor could the fact have been discovered, except with the aid of an expert, by a careful scrutiny of the books, and by tracing the checks through the clearing house. There is no evidence that this money has ever been paid back to the

city, or that the city has ever made any demand for it, or ever had any notice of the transaction before the bank failed.

The court finds that Haugen, the successor of Kortgaard as city treasurer, "has proved its claim against said bank in this action for a sum exceeding $106,000, which sum was due from said bank to said city at the time of the failure of said bank." But it clearly appears, from the thirtieth finding, in connection with the schedule of claims attached to the findings, that this claim is for money deposited on open account by Haugen himself as city treasurer subsequent to February 15, 1893. Hence, upon the findings, it must be assumed that the city has never made any claim against the defendant bank for the money which Kortgaard misappropriated, but that the bank still retains the benefit of it as part of its assets.

On June 22, 1893, the bank closed its doors, and suspended business, and on the 27th of the same month made an assignment of all its property for the benefit of its creditors. There have been filed and allowed against the bank claims for over $500,000, including a preferred claim in favor of the state for $75,000. The assets in the hands of the assignee, after paying the claim of the state, will not pay over 10 per cent. of the other claims. Eighty-four persons, with claims aggregating over $40,000, became creditors subsequent to September 1, 1892, and prior to February 15, 1893. One hundred and fifty-two others, with claims aggregating nearly $270,000, became creditors subsequent to February 15, 1893. But the court finds that it does not expressly appear whether any of these creditors became such or contracted with the bank upon the faith or credit of the apparent ownership of this stock by the defendants.

About a year after the bank failed each of the defendants brought an action to have the stock issued to him canceled and declared null and void, offering to return the dividends which they had received. These actions are still pending. So far as appears, this was the first movement looking to a rescission or a repudiation of the relation of stockholders.

It must be apparent, from this statement of facts, that this case, in all its legal aspects, is fully covered by the decision in Dunn v. State Bank, 59 Minn. 221, 61 N. W. 27, which was an action brought by a holder of some of this increased stock to have it canceled, and adjudged null and void, on the same grounds which are here urged

67 M.—18

by way of defense. Indeed, the facts found make a weaker case for the defendants than did the facts alleged in the Dunn case, except, possibly, in the single particular that the court here finds, in substance, that the defendants could not, by the exercise of reasonable diligence, have discovered the fact that Kortgaard had paid for his stock with city funds. But the very eminent counsel for the defendants have earnestly contended that this case is distinguishable from the Dunn case, and, even if it is not, that that case was wrongly decided, and should not be followed. For this reason, accentuated by the fact that the learned trial judge intimates his doubts as to the correctness of the decision in that case, and the further fact that the questions involved are very important, we have carefully re-examined the whole ground with a determination not to be deterred by any false pride of opinion from overruling the Dunn case if we should become satisfied that it was erroneously decided.

Treating this increased stock, not as absolutely void, but only voidable, on the ground of fraud, it must be clear that, under any rule, either English or American, the defendants have no defense, now that the bank has become insolvent and the rights of creditors have become vested. In view of the length of time which elapsed after the stock was issued before the bank failed, the want of diligence on part of the defendants in not sooner discovering at least the utter and hopeless insolvency of the bank, and the large amount of corporate indebtedness created since the stock was issued, and which is still outstanding, the right to rescind should be denied, according to the overwhelming weight of authority in this country, even from those courts which have not adopted the English rule. As is said by a learned judge in one of the very cases cited by defendants: [3]

"When a corporation becomes bankrupt, the temptation to lay aside the garb of a stockholder, on one pretense or another, and to assume the role of a creditor, is very strong, and all attempts of that kind should be viewed with suspicion."

A person is not an outlaw because he has taken stock in a corporation, but when he does so knowing, as he must, that credit will be given to the corporation upon the faith of that stock, as the law presumes, and the corporation subsequently becomes insolvent, the

[3] Thayer, J., in Newton Nat. Bank v. Newbegin, 74 Fed. 135, 140.

equities of the creditors are, at least under all ordinary circumstances, superior to his. This is one of the risks which he necessarily takes in assuming the relation of stockholder.

Counsel for the defendants do not seem to combat this very earnestly, but their main contention is that this increased stock, never having been fully paid for,—the payment by Kortgaard with city funds being, as they claim, no payment at all,—was not merely voidable, but absolutely void, never had any legal existence at all as stock, and therefore never conferred upon the holders any of the rights, or imposed upon them any of the duties or obligations, of stockholders. In support of this position they invoke G. S. 1894, § 2498, which reads as follows:

"Any association organized under the provisions of this chapter [33] may, by its articles of association, provide for an increase of its capital from time to time, as may be deemed expedient, subject to the limitations of this chapter. But no increase of capital shall be valid until the whole amount of the increase proposed is paid [in] in cash, and such payment certified under oath by the president or cashier of such association to the state auditor, who shall give his certificate that the provisions of this section have been complied with, and specifying therein the amount of such increase of capital stock, with his approval thereof, and that it has been duly paid in as a part of the capital of such association. * * *"

Reference is also made to section 466 of the Penal Code,[4] which makes it a crime, punishable by imprisonment in state's prison, for any officer of a bank, knowingly, willfully, and with intent to defraud, to sell or issue any certificate of shares, contrary to the charter or laws under which the corporation exists, or in excess of the power of the corporation, or the limit imposed by law or otherwise upon its power to create or issue stock.

It seems to us that counsel are in error in assuming that payment for the stock by Kortgaard with city funds amounted to no payment at all. Conceding, without deciding, that the bank was chargeable with notice that the money with which the stock was paid for was city funds, wrongfully converted by Kortgaard, and that the city might have recovered it back from the bank, still, according to the findings, it has never asserted any such claim, and, for anything that appears, may never do so, but leave the bank to enjoy

4 G. S. 1894, § 6762.

the benefit of the payment the same as if made with Kortgaard's own funds.

But we are not disposed to rest the decision of the case on this ground. It seems to us that the fundamental error of counsel is in claiming too much for the statute when they contend that, if this stock was not in fact all fully paid in, it is ultra vires, and absolutely void for all purposes and as to all persons. Their chief reliance in support of this position is the expression "no increase of capital shall be valid until," etc. This provision was substantially copied from the national banking act. It was intended to secure the actual payment of stock, so as to prevent what is called "watering stock." Aspinwall v. Butler, 133 U. S. 595–608, 10 Sup. Ct. 417. According to the views expressed in that case, this provision would have been violated by the issue of more stock than had been paid for, but not by an issue of the exact amount that was paid for. If this is so, it would seem to settle the question of the validity of at least the 15 shares issued to the Williamses which they paid for in full with their own money. But, if the whole of this increased stock is absolutely void, because not all fully paid in, we do not see why the same argument would not apply, and the same result follow, as to original stock issued in violation of some express provision of statute.

For example, a bank is forbidden to commence business before the minimum amount of capital, $25,000, has been paid in cash, and such payment certified to the state auditor under oath by the president or cashier. But it would never do to hold that, after a bank had gone into business, and dealt with the public, in violation of this provision of the statute, its stock was void, and that the stockholders were not liable as such creditors. Again, we have a statute [5] which provides that corporations having capital stock divided into shares shall not issue any shares for a less amount to be actually paid in on each share than the par value of the shares first issued. If stock was issued in violation of this express provision of statute, we apprehend no court would hold, as against creditors, that the stock was absolutely void, so as to exempt the holders from liability. It is true that neither of the provisions referred to use the term "invalid," or "not valid," but the acts suggested are none the less illegal, being positively prohibited by statute.

[5] G. S. 1894, § 3415.

·The authorities upon the question when stock is ultra vires, in the sense of being absolutely void, and having no legal existence as stock for any purpose, are not altogether clear or satisfactory. We have examined almost every case cited by appellants, and, while some of them contain dicta which seem to support their position, we have found no well-considered case which is not, in our judgment, clearly distinguishable from the present one, both in its facts and in what was actually decided. Some of them are cases where the relation of stockholder had never been consummated, but the defendant was sued on his subscription for stock, and the defense was that the stock of the corporation had never been all subscribed for, and the court simply held, in accordance with a very elementary doctrine, that a subscription for stock is made on the implied condition that all of the stock will be taken, and that, where the condition has not been fulfilled, or waived, the subscriber is not liable on his contract, whether the action be brought by the corporation or by a receiver.

There are other cases where the holder of stock, not guilty of any laches, seasonably brought an action to rescind while the corporation was a going concern, but its insolvency ensued while the action was still pending, and it was held that the subsequent insolvency did not affect or abate the plaintiff's right to prosecute his action. None of these cases are in point, or furnish any aid in the determination of the present one.

The most numerous class of cases cited by counsel, and those mainly relied on, are those where the issue of stock was beyond the limit fixed by the statute or the articles of association—with notice of both of which all the world is chargeable—which the corporation could issue under any circumstances, and hence ultra vires and void. Nearly allied in principle to these are cases where the charter or articles of association fix the capital at a certain amount, with authority to increase it to a larger amount by a vote of the stockholders, but the increased stock was issued without any such vote.

Some cases hold that, in such case, the stock is wholly ultra vires and void. This seems to proceed upon the theory that the vote of the stockholders is analogous to, or the equivalent of, an amendment of the articles of association, and that therefore the case supposed is the same in principle as where stock is issued beyond the

limit fixed by the statute or articles of association. In that class of cases the corporation had no power to issue the stock at all, and the whole world was chargeable with notice of the fact. But in the present case the statute and articles of association gave the stockholders the power to make the increase, and they voted to do so. Therefore the power to issue the stock existed, and creditors could, without fault, assume that all the subsequent requirements of the statute had been fully performed. The defect, if any, was that all these requirements had not in fact been fully complied with, although certified to under oath by the cashier and by the bank examiner. This distinction is clearly pointed out in Veeder v. Mudgett, 95 N. Y. 295, and Handley v. Stutz, 139 U. S. 417, 11 Sup. Ct. 530, which last case the court distinguishes, on that very ground, from Scovill v. Thayer, 105 U. S. 143.

It seems to us that this suggests the correct line of cleavage between void and voidable stock, at least where the corporation has become insolvent and the vested rights of creditors have intervened. To hold that increased stock is ultra vires, and absolutely void, because not all fully paid' for, would convert into a shield for fraudulent or negligent stockholders a provision of statute which was designed for the protection of the public, and especially of creditors, who might trust the corporation. The effect of such a holding would not be merely to relieve the holders of this stock from all liability to creditors, for the inevitable logic of such a decision would be to permit them to convert themselves into creditors of the corporation for the amount which they had paid in for the stock.

If this stock is ultra vires, so that it never had any legal existence as stock for any purpose, we fail to see any principle on which even Kortgaard himself might not assert the fact, had he continued to hold it. To permit him to do so would, we apprehend, shock the conscience of any court. But how can it be stock in Kortgaard's hands, and not stock in the hands of his transferees? Again, suppose this bank was still a going and prosperous concern, and the Williamses were asserting against it the rights of stockholders on the shares which they purchased and paid for in full; would it be held that the bank could successfully resist their claim on the ground that Kortgaard had not paid for his stock, or had paid for it with stolen money? We think not. But how could it be stock

when they are asserting rights under it, and not stock when creditors are seeking to hold them liable on it?

We therefore adhere to all that was decided in the Dunn case, and our conclusion is that this stock was at most only voidable while the bank was still a going concern, but that, under the facts, the right, as against creditors, to avoid or rescind, no longer exists.

Order affirmed.