BENJAMIN F. LANGWORTHY v. C. C. WASHBURN FLOURING MILLS COMPANY.

July 12, 1899.

Nos. 11,692—(201).

### Fire Insurance—Flour Mill.

A mutual insurance company was authorized by its charter to insure "dwelling houses, household furniture, farm buildings, and other property against loss or damage by fire." It issued its policies to the defendant on its flour mills in consideration of its premium notes. This is an action to collect the amount of an assessment on the notes. *Held*, that the policies were valid, and, the defendant having had the benefit of the insurance contract, it is liable on its notes.

### Findings Sustained by Evidence.

*Held*, that the evidence sustains the findings of the trial court to the effect (a) that the insurance company was authorized to do business in this state; (b) that the premium notes were given for a valuable consideration, and were not obtained by fraud or false representations; (c) that the defendant's liability for losses occurring during the life of its policies was not settled and terminated when it surrendered them; (d) that the defendant (except as to one item) was assessed only for its pro rata share of the losses incurred during the period of its membership.

### Premium Note—Assessment for Receivership.

An assessment, on premium notes to a mutual insurance company,

.made after the company has become insolvent, and a receiver has been
appointed, may properly include the expenses of winding up its affairs.

## Statute of Limitations.

*Held,* following Langworthy v. Garding, 74 Minn. 325, that this action
is not barred by the statute of limitations or by laches.

Action in the district court for Hennepin county by plaintiff, as
receiver of the Mutual Fire Insurance Company of Chicago, to re-
cover $906.91 and interest on premium notes. The case was tried
before Elliott, J., who found in favor of plaintiff; and from an order
denying a motion for a new trial, defendant appealed.    Affirmed.

*Warner, Richardson & Lawrence,* for appellant.

*C. W. Greenfield* and *Wicks, Paige & Lamb,* for respondent.

START, C. J.

This action was brought by the plaintiff, as receiver of the Mutual
Fire Insurance Company of Chicago, to recover from the defendant
an assessment made on its premium notes to the company by a de-
cree of the circuit court of the county of Cook, Illinois. The insur-
ance company about August 1, 1889, issued to the defendant two
policies of insurance on its property, in consideration of two premi-
um notes executed by the defendant to the insurance company, in
the aggregate amount of $4,250, payable, by instalments, at such
time as the directors of the company might order and assess for the
losses and expenses of the company. The answer admits the exe-
cution of the premium notes and policies, but alleges several affirm-
ative defenses to this action, which are hereinafter referred to in
detail. The trial court made its findings of fact, and, as a conclu-
sion of law, directed judgment for the plaintiff for the amount
claimed, and the defendant appealed from an order denying its mo-
tion for a new trial.

1. The policies in question purported to insure the defendant
against loss or damage by fire to its flour mills, and its first defense
was that the insurance company had no power to insure such prop-
erty; hence it was not liable on its premium notes. The trial court
found that it had such power, and the defendant assigns the ruling
as error.

The insurance company was organized, under a statute of the state of Illinois,

"For the purpose of insuring dwelling houses, household furniture, farm buildings, and other property against loss or damage by fire."

The defendant's contention is that the words, "and other property," must be limited to other property of the same character as that specified; hence they do not include mills of any kind. This provision of the charter of the insurance company was construed in the case of Thompson v. Mutual, 66 Ill. App. 254, and it was held that the company might lawfully insure mills. The claim of the defendant that this construction of the charter of the company is not binding on the courts of this state, because not pleaded, and because the decision was not given by the highest court of the state of Illinois, may be conceded, without so deciding. The construction to be given to the charter provisions in question is not entirely clear. It is certain, however, that some meaning must be given to the words "and other property," and the rule of ejusdem generis must not be applied so strictly as practically to eliminate them. The company manifestly had power to insure other property, as well as dwelling houses and farm buildings. The officers having issued policies on such other property, they were enforceable against the company, for such act was not manifestly in excess of the powers of the corporation. The officers might, in perfect good faith, have construed its charter as authorizing the insurance of mills. The policies were therefore valid as to the assured, who had accepted them, and given premium notes therefor, in good faith, whatever construction might be given to the charter of the insurance company if its power to insure such property was directly challenged by the state. The defendant having had the benefit of the insurance contract, and the company having borne its burden, each is now estopped to question its validity. Auerbach v. Le Sueur Mill Co., 28 Minn. 291, 9 N. W. 799; Columbia Electric Co. v. Dixon, 46 Minn. 463, 49 N. W. 244; American T. & S. Bank v. Gluck, 68 Minn. 129, 70 N. W. 1085. The trial court correctly overruled the defendant's first defense.

In reaching this conclusion, we have not overlooked the case of

Rochester Ins. Co. v. Martin, 13 Minn. 54 (59), cited and relied on by the defendant. The facts of that case were that the plaintiff was organized and authorized to do business only as a fire insurance company. It issued a policy to the defendant, purporting to insure his live stock against accident and disease resulting in death. The note sued on was given for such a policy. The defendant answered to the effect that the sole consideration for the note was the issuing of the policy, and alleged fraud in fact in obtaining the note. The plaintiff demurred to the answer, and it was held by this court that the answer stated a defense, for the reason, as stated by the court, that

"The defendant alleges that he was induced to enter into the contract by the false and fraudulent representations of the plaintiff's agent, and that he did not discover the fraud until after the commencement of this action. Under these circumstances he is justified in law and morals in repudiating the contract. He has received no consideration except the promise which the plaintiff's agent had no right to make, and which the defendant could not enforce."

The distinction between the two cases is obvious, and the one cited is not here in point.

2. The second defense interposed was to the effect that the insurance company did not comply with the provisions of our statutes, so as to be authorized to do business in this state. The trial court found that it had, and the defendant assigns the finding as error, on the ground that it was not justified by the evidence.

The burden of showing noncompliance with the statute by the company was upon the defendant. Langworthy v. Garding, 74 Minn. 325, 77 N. W. 207. The evidence warrants the conclusion that the insurance commissioner of this state issued to the company each year it was doing business in this state a license or certificate of authority to do business as required by law. Whether the evidence offered by the defendant was sufficient to overcome the presumption arising from the act of the insurance commissioner was fairly a question of fact for the trial court. The finding complained of is sustained by the evidence.

3. The third and fourth defenses may be considered together.

They are to the effect that the premium notes were without consideration, and so void, by virtue of G. S. 1894, § 3173, and that they were obtained by false representation and deceit.

The statute referred to is to the effect that if any insurance company doing business in this state falsely represents or holds out to the public, by means of any advertisement, circular, notice, or statement, published or circulated through the agency of any officer, agent, or other person, or by any other means, that the capital stock of such company is greater than its actual amount, or that its accumulation is greater than its value, all money or obligations thereafter received for insurance shall be deemed to have been taken without consideration. This statute is penal in its nature, and must be strictly construed. The representation must not only be erroneous and published, but it must be knowingly false. It is difficult to see how this statute can apply to a mutual insurance company which has no capital stock, and where there is no liability on the premium notes except for actual losses during the time the makers are enjoying indemnity against loss by virtue of the policies for which the notes were given. The real consideration for the notes does not accrue, it would seem, at the time they are made, but from time to time, as the insured enjoys indemnity against loss. However this may be, we are of the opinion that the evidence is not sufficient to bring this case within the statute.

The trial court found as a fact that neither the insurance company, nor any of its officers or agents, were guilty of any fraud in obtaining the premium notes in question or procuring the acceptance of the policies by the defendant. The defendant claims this finding was error, and that, under the evidence, the court ought to have affirmatively found that the notes were obtained by fraud.

The evidence as to the alleged misrepresentations, briefly stated, is this: Mr. Bailey, the secretary of the defendant company, testified that Mr. Smith, the secretary of the insurance company, gave to him a statement of the financial condition of the insurance company as of December 31, 1888, and stated that it was a copy of the statement filed with the insurance commissioner of this state; that he compared it with the statement so filed, and found that the two statements were alike; thereupon, and in reliance upon the state-

ment, he gave the premium notes and accepted the policies for the defendant.  The statement was as follows:

### Assets.

| | |
|---|---|
| Total cash assets | $141,881 83 |
| Deposit notes | 450,640 62 |
| Total | $592,522 45 |

### Liabilities.

| | | |
|---|---|---|
| Unpaid losses | | $ 40,256 25 |
| Reserve for reinsurance on mutual policies | $40,693 29 | |
| Reserve for reinsurance on cash policies | 44,460 00 | |
| | | 85,153 29 |
| | | $125,409 54 |

| | |
|---|---|
| Surplus as to policy holders | $467,112 91 |
| Net cash surplus | $ 16,472 15 |

Mr. Smith, the secretary of the company, testified that at this time there had been paid to it advanced premiums in the sum of $52,000, for which its certificates of indebtedness had been issued, pursuant to the by-laws of the company.  The defendant claims that these certificates constituted a liability, and that they did not appear in the statement; hence it was false and fraudulent.  The by-laws of the company, under which the advance premiums were paid and the certificates therefor issued, provided that all money paid as advanced premiums should be held liable for the losses and expenses of the company, and that the persons making such advances should be held as members of the company, and share in the profits of the business; and, further, that the fund should not be divided among the members, except that, whenever the company should be dissolved, whatever remained of the fund, after the payment of all its liabilities of every kind, including outstanding certificates, should be distributed to the members,

"Pro rata, share and share alike, according to the amounts by them respectively paid for premiums of insurance on their policies or certificates then in force."

The certificates on their face recited that the company had received from the holder thereof the amount therein stated,

"In advance, for premiums of insurance, which amount and every part thereof is liable for the expenses and losses of the company, and until the redemption of this receipt shall bear interest at the rate of 7 per cent. per annum, * * * and the company is hereby obligated to accept this receipt at par when presented in payment for premiums of insurance accepted or on account thereof."

It is clear, from the provisions of the by-laws, that these certificates were not a liability of the company as against creditors, including the policy holders, as the advance premium, as represented by the certificates, was liable for the losses of the company, and none of it was subject to distribution until all liabilities were paid. The obligation of the company to accept the certificates, if presented in payment for future insurance, was, at least, a contingent liability against the company. The evidence shows that the board of directors of the company did redeem these certificates during the year 1890. Whether the amount of the advance premium as represented by the outstanding certificate was taken into account in making the statement in question, is left in some doubt by the evidence. Mr. Smith was the only witness on the subject. He testified that

"The advance premiums were on the books the same as all premium receipts, and I assume in those statements they would appear as a part of the reinsurance reserve. * * * I said it did not appear, unless it did in the reinsurance reserve. If it were figured at the half, it would probably appear in the cash reinsurance reserve. Q. Well, was it figured in either one of those reserve insurances? A. I could not tell you that, I should judge not, at that time."

The record shows that in December, 1889, the company made a special assessment of 10 per cent. on its premium notes. Thereupon Mr. Bailey, who seems to have been entirely familiar with insurance matters, went to Chicago for the express purpose of investigating the affairs of the company, and did so. He testified that the officers exhibited to him all the books and records that he asked to see, that he then knew all the books that were necessary to show the affairs of a mutual insurance company, and that he there found all the

books necessary properly to conduct the business of the company, but he was not shown the books in which the advance premium account was kept, and he was not informed in any way concerning such advance premiums. On the strength of his investigation, the defendant paid the assessment, and retained its policies, until March 28, 1890, when it surrendered them, and they were cancelled, and the company returned to it $120, unearned premium, pursuant to the provisions of the policies.

The defendant having retained its policies and received the benefit of the indemnity until it surrendered them, and until the rights of third parties, its fellow members, had accrued, it is, at least, doubtful whether it can now, when called upon by their representative, the receiver, to contribute its pro rata share for the payment of losses occurring while its policies were in force, avail itself of the defense that the premium notes were obtained by fraud, even if it has established the alleged fraud. The transaction was, at most, voidable, at its election. See Dunn v. State Bank, 59 Minn. 221, 61 N. W. 27; Olson v. State Bank, 67 Minn. 267, 69 N. W. 904; Palmer v. Bank of Zumbrota, 72 Minn. 266, 75 N. W. 381; Wyman v. Gillett, 54 Minn. 536, 56 N. W. 167; Dettra v. Kestner, 147 Pa. St. 566, 23 Atl. 889. However this may be, the burden was upon the defendant to establish, by clear and satisfactory evidence, its alleged defense, and, upon the whole evidence, we are of the opinion that the finding of the trial court, that neither the company nor any of its officers were guilty of fraud in obtaining the premium notes and procuring the acceptance of the policies by the defendant, is not so manifestly against the weight of the evidence as to justify us in setting the finding aside. It is sustained by the evidence.

4. The next defense relied on is that the defendant's liability to assessment for losses occurring during the time its policies were in force was absolutely terminated when the policies and premium notes were surrendered, on March 28, 1890. The policies contained a provision to the effect that they might be surrendered and cancelled at any time by the insured upon certain conditions, but they also contained this provision:

"All contingent liability of the insured shall cease and deter-

mine upon the termination of this policy from any cause so far as regards losses and expenses incurred subsequent to such termination, but the liability as regards prior losses and expenses shall not terminate until all the assessments levied against it are paid in full."

If the policies were cancelled pursuant to the provisions therein contained, the defendant, by virtue of the provisions we have quoted, remained liable to assessment for losses incurred during the time it was a member of the company. Swing v. H. C. Akeley Lumber Co., 62 Minn. 169, 64 N. W. 97. This proposition is not seriously controverted by the defendant, but it insists that the transaction was not a cancellation under the terms of the policies, but that it was a settlement between the parties,—"a jumping of claims, and a compromise of claims, on both sides." The evidence does not sustain this contention. On the contrary, it is sufficient to support the contention of the plaintiff that the cancellation was by virtue of the terms of the policies.

5. The defendant, while conceding the propriety and necessity for making the assessment and the amount that must be raised thereby, insists that it was made upon a wrong basis, in that it ignored the amount of premium notes outstanding at the date of any particular loss; and, further, that it is assessed for losses and liabilities not incurred during the life of its policies.

The plaintiff contends, on the authority of Langworthy v. Garding, 74 Minn. 325, 77 N. W. 207, that the assessment cannot be collaterally attacked by the defendant, on the ground that an error has been made in the computation of the assessment against it, for the reason that, if each member was allowed to defend on that ground when separately sued, different courts might hold differently on the same question, which would result in an unequal distribution of the burden of paying the losses. We do not understand the case cited to go to the extent of holding that if the assessment is made upon a principle or basis not authorized by the terms of the charter of the company and the policies, and which produces inequality between the different members (which seems to be the claim of the defendant), a member, when sued separately, may not attack the assessment on this ground.

Be this as it may, we find it unnecessary to discuss and decide the disputed question as to the limitation to be placed upon collateral attacks upon assessments made by a decree of court; for, with a single exception, there is no warrant in the record for the claims made by the defendant. The exception was an item of $10,000 for losses incurred by the company, July 31, 1889, which was included in the amount of losses for the payment of which the defendant was assessed. Its policies, although dated July 27, did not go into effect until August 1. Hence it was admitted error to so include the $10,000 item. The error, however, was not discovered until after the trial court had made its findings, when the plaintiff made a motion to have the findings and conclusions of law modified so as to reduce the amount of the plaintiff's recovery by a sum equal to the amount included in the assessment on account of such prior losses. The ascertainment of such sum was a mere matter of computation, based on data shown by the record. The difference would be about $100. The defendant opposed the motion, and it was denied. The plaintiff offers in this court to remit the excess occasioned by such error. It would be manifestly unfair to reverse this case because of such error, for the opportunity to have it corrected in the district court was not only tendered to the defendant, but the plaintiff did all in his power to secure the correction, which presumably would have been made if the defendant had not objected to the granting of the motion. Therefore it has waived its right to insist on the error in this court.

The defendant further objects to the assessment because $25,000, the estimated cost of administering the estate, was included as a liability. The payment of the expenses of the company, as well as its losses, was secured by the premium notes; and it was just as necessary to raise a fund by assessment to pay the necessary expenses of closing up the affairs of the company as it was to secure a fund with which to pay its losses, and it was proper to include such expenses in the assessment. Davis v. Shearer, 90 Wis. 250, 62 N. W. 1050. The defendant was assessed for its pro rata share of the expenses only.

It is also claimed on behalf of the defendant that a liability amounting to $20,000, for unearned premiums, was included in the

assessment against it.   Such a liability accrued on the failure and assignment of the company, and had no existence when the defend-' ant, on March 28, 1890, ceased to be a member as to future losses and liabilities.   But it appears from the record that this item was not included in the amount of the liabilities for which the defendant was assessed.   It was only included in the liabilities of members whose policies were in force when the company failed, and the defendant was not assessed for any part of it.

Except as we have stated, the evidence does not justify the conclusion that the defendant's assessment was for any greater sum than its fair pro rata share of the expenses and losses that were incurred during the period of its membership.

6. The last claim of the defendant is that this action is barred by the statute of limitations and by laches.   The cause of action did not accrue until the assessment was made, which was on July 3, 1891.   The receiver made demand on the defendant for payment of its assessment promptly after it was made.   Payment was refused, and this action was commenced December 22, 1896.  ˙ The action is not barred, either by the statute or by the laches of the plaintiff.   Langworthy v. Garding, 74 Minn. 325, 77 N. W. 207.

Order affirmed.