## BURNINGHAM v. BURKE et al.

No. 4261.   Decided January 25, 1926.   Petition for Rehearing Denied
May 5, 1926.   (245 P. 977).

1. APPEAL AND ERROR—REVIEW OF ORDER FOR NONSUIT, IN SUIT TO
RECOVER AMOUNT OF STOCK SUBSCRIPTION INDUCED BY FRAUDU-
LENT MISREPRETATIONS, IS CONFINED TO DETERMINATION WHETHER
EVIDENCE SUPPORTED COMPLAINT OR PLAINTIFF WAS GUILTY OF
LACHES OR ESTOPPED.   Where, at close of plaintiff's evidence,
motion for nonsuit was granted on grounds of insufficiency of
evidence to support misrepresentations in sale of stock to plain-
tiff or that plaintiff had not acted promptly in attempting to
rescind and was estopped to recover, appeal therefrom is con-
fined to review of record to ascertain whether evidence was suf-
ficient to support material allegations or whether plaintff was
guilty of laches or estopped to recover.

2. APPEAL AND ERROR.   On appeal from judgment of nonsuit, evi-
dence must be viewed in light most favorable to plaintiff.

3. TRIAL—IF, WHEN PLAINTIFF RESTS, EVIDENCE IS INSUFFICIENT
TO PERMIT RECOVERY, IT IS COURT'S DUTY TO GRANT MOTION FOR
NONSUIT.   If, when plaintiff rests, there is no substantial evi-
dence to support material allegations to entitle him to recover or
he is conclusively shown guilty of laches or estopped from recov-
ering, it is court's duty to grant motion for nonsuit.

Corpus Juris-Cyc. References:

[1]   Appeal and Error 4 C. J. p. 668 n. 49.
[2]   Appeal and Error 4 C. J. p. 764 n. 61.
[3]   Trial 38 Cyc. p. 1947 n. 55.
[4]   Appeal and Error 4 C. J. p. 663 n. 92.
[5]   Trial 38 Cyc. p. 1947 n. 50.
[6]   Corporations 14 C. J. p. 663 n. 96.
[7]   Corporations 14 C. J. p. 663 n. 96.
[8]   Corporations 14 C. J. p. 596 n. 35; p. 597 n. 36, 40.
[9]   Equity 21 C. J. p. 244 n. 8.
[10]   Equity 21 C. J. p. 223 n. 30.
[11]   Equity 21 C. J. p. 217 n. 2.
[12]   Equity 21 C. J. p. 221 n. 26.
[13]   Corporations 14 C. J. p. 599 n. 49.
[14]   Corporations 14 C. J. p. 600 n. 57.
[15]   Corporations 14 C. J. p. 601 n. 60.
[16]   Corporations 14 C. J. p. 599 n. 49.

Appeal from Third District

4. APPEAL AND ERROR—THOUGH COURT ERRED IN GRANTING MOTION FOR NONSUIT ON GROUND ASSIGNED, IF IT SHOULD HAVE BEEN GRANTED ON OTHER GROUNDS OF MOTION, RULING WILL BE UPHELD. Though court erred in granting motion for nonsuit on ground assigned, if it should have been granted on other grounds of the motion, the ruling must be upheld.

5. TRIAL. To overcome motion for nonsuit, plaintiff is not required to prove case by clear and convincing evidence.

6. CORPORATIONS. Evidence *held* sufficient to support allegations of misrepresentation of corporation's assets in sale of its stock and that plaintiff relied thereon in making purchase.

7. CORPORATIONS—EVIDENCE IN SUIT TO RESCIND SUBSCRIPTION AND PURCHASE OF STOCK IN CORPORATION FOR MISREPRESENTATION HELD NOT TO SHOW AS MATTER OF LAW THAT PURCHASER WAS GUILTY OF LACHES, THOUGH CORPORATION HAD BECOME INSOLVENT. Evidence in suit to rescind subscription after corporation's insolvency, and when it was in receivership, *held* not to show as matter of law that purchaser of stock, after discovering false representations, was guilty of laches.

8. CORPORATIONS—ONE CANNOT RESCIND SALE OF PURCHASE OF STOCK FOR FRAUD, IF GUILTY OF LACHES OR UNREASONABLE DELAY IN DISCOVERY THEREOF OR IN REPUDIATING IT, AND IS CHARGEABLE WITH FACTS WHICH ORDINARILY PRUDENT PERSON OUGHT TO HAVE DISCOVERED. A person cannot rescind a contract for purchase or sale of stock for fraud, if guilty of laches or of unreasonable delay, either in discovering the fraud or in repudiating the contract after discovery, and, if there are facts which ought to have put a person of ordinary prudence on inquiry, he is chargeable with knowledge as would have been obtained thereby.

9. EQUITY. Laches cannot be imputed to one who is ignorant of facts and for that reason failed to assert his rights.

10. EQUITY. To bar relief against fraud, laches must not only consist of delay, but of delay which worked to the disadvantage of the opposite party.

11. EQUITY. Ordinarily, whether laches exists is dependent on the particular facts and circumstances.

12. EQUITY. Mere delay, unless unreasonable and inexcusable, is not enough to impute laches.[1]

---

[1] *Hamilton* v. *Dooly*, 49 P. 769, 15 Utah 280.

13. CORPORATIONS—SUBSCRIBER OR PURCHASER OF STOCK IN SOLVENT CORPORATION MAY RESCIND CONTRACT FOR FRAUD AFTER CORPORATION IS INSOLVENT AND IN RECEIVERSHIP, EXCEPT AS TO SUBSEQUENT CREDITORS, IGNORANT OF FRAUD, WHO RELIED ON SUBSCRIPTIONS AND BECAME SUCH BEFORE INSOLVENCY. Where one subscribed for or purchased stock of solvent corporation, he, for fraud or misrepresentation, may rescind contract, if otherwise entitled to or is not guilty of laches, even after corporation is insolvent and in receivership, except as to subsequent creditors, who, in ignorance of fraud and in reliance on subscription or purchase, become such thereafter and before corporation's insolvency.[2]

14. CORPORATIONS—IN SUIT TO RESCIND STOCK SUBSCRIPTION, BURDEN OF PROOF IS ON RECEIVER AND SUBSEQUENT CREDITORS TO SHOW THAT LATTER BECAME SUCH BEFORE INSOLVENCY AND BEFORE APPOINTMENT OF RECEIVER. In suit by subscriber of stock to rescind contract after insolvency of corporation and when it is in receivership, burden of proof is on receiver and subsequent creditors to show that latter became such before insolvency and before appointment of receiver.

15. CORPORATIONS—TO GIVE SUBSEQUENT CREDITORS EQUITIES OVER DEFRAUDED STOCKHOLDER, FACTS IN ADDITION THAT DEBT WAS INCURRED SUBSEQUENT TO SUBSCRIPTION OR PURCHASE, SHOULD BE SHOWN. To give subsequent creditors equities over a defrauded stockholder, it is not essential that it be shown by direct evidence that they relied on stock subscription, but, to justify such reliance, there ought to be shown facts and circumstances in addition to fact that substantial amount of debt was incurred or credit given subsequent to stock subscription or purchase.

16. CORPORATIONS—IN SUIT TO RESCIND STOCK SUBSCRIPTION, AFTER CORPORATION WAS IN RECEIVERSHIP, DEFENSE OF EQUITIES OF SUBSEQUENT CREDITORS WAS PROPERLY INTERPOSED BY THE RECEIVER. In suit to rescind stock subscription for fraud, after corporation's insolvency and when it was in receivership, defense of equities of subsequent creditors was properly interposed by the receiver.

Appeal from District Court, Third District, Salt Lake County; *G. A. Iverson*, Judge.

---

[2]*Callahan* v. *Pioneer Nurseries Co.*, 164 P. 878, 49, Utah 541, 19 A. L. R. 1082; *Passow & Sons* v. *Wetherbee*, 167 P. 350, 50 Utah, 243.

Action in equity by H. I. Burningham against J. J. Burke, receiver, and others. Judgment for defendants, and plaintiff appeals.

Reversed, and remanded for new trial.

*H. L. Mulliner,* of Salt Lake City, for appellant.

*B. Liberman* and *Dey, Hoppaugh & Mark,* all of Salt Lake City, for respondents.

STRAUP, J.

This is an action in equity, brought by the plaintiff, the appellant, to rescind a subscription or purchase of capital stock and to recover back moneys paid by him thereon. It is in substance alleged in the complaint that the defendant Utah Steel Corporation was a domestic corporation organized in July, 1919, and that the defendant Burke was appointed its receiver in July, 1922; that in the latter part of 1921 and in January, 1922, the corporation entered upon a campaign of selling its capital stock to the plaintiff and to the public generally and in such connection published and circulated pamphlets, circulars, and advertisements in newspapers and employed agents to sell its capital stock and to solicit subscriptions therefor; that in such publications and otherwise the corporation represented that it was soundly financed and prosperous, was in good financial condition and standing, and that it had sufficient funds to take care of its debts and obligations, that it did not need money and did not sell its stock to meet obligations or to pay debts, or to carry on its regular business, but that the stock was sold to build additional furnaces at its plant and to acquire and develop new and additional properties, and that the money derived by it from sales of its stock was being set aside and used only for such purpose, that, when it offered and sold to plaintiff its stock, it represented that a half million dollars worth of stock had already been sold for cash, "during

such drive or campaign," and that sufficient proceeds had already been received from sales of stock to assure the success of the erection of a number of additions to the plant which would give it a large increase in production and in profits; that the corporation was offering for sale about $3,000,000 worth of preferred stock, and that a large steel corporation of California, naming it, had agreed to buy most of such stock, so that the sale of $3,000,000 of stock at par was assured, and that there was only a limited amount of stock that could be sold to the plaintiff and others in Utah; that the corporation, through its operations, had increased its investments over 1,000 per cent., from $175,000 to $1,-800,000, which increase was from profits and earnings; that in addition thereto the company had paid regular dividends to its preferred stockholders, and that in 1921 it had an investment of the value of over $2,000,000, that the corporation owned 10,000,000 tons of high grade iron ore in Utah, and that it had a contract with a fuel company, naming it, for its coke and coal requirements, which gave the company a big advantage; that its plant at Midvale, Utah, at that time had a capacity of 72,000 tons of steel products per year, that the corporation was operating to its full capacity and required additional capital to supply the demand for its products; that when its new buildings and blast furnaces, which were to be constructed from the proceeds derived from the sales of its stock, were completed, the corporation would have no competition from western steel works, and that there was no mill manufacturing sheet steel or tin plate or steel foundry pig iron anywhere west of the Mississippi river; that the corporation owned lands of the value of over $74,000 without the improvements; that the buildings and improvements thereon were of the value of over $453,800, the machinery and tools of the value of over $1,065,000, its furniture and fixtures of the value of over $9,000; that its currrent assets, consisting of cash and inventories on hand, and bills and accounts receivable, amounted to over $366,400, its current liabilities to about

$367,400; that it had a reserve set aside to cover depreciation in the sum of over $254,600, and that it had earned and actually had on hand a surplus of $776,866.98; that a number of prominent citizens of the state of Utah, well known as men of financial standing, naming them, had purchased a large amount of the stock, some of them as much as $100,-000 at par value, some $50,000, and a bank $10,000; that the securities commission of Utah had made a thorough investigation of the condition of the company and had found it to be in good condition; that a railroad company had material on the ground for building a railroad to the ore deposits owned by the company and consisting of millions of tons; that the corporation was going ahead immediately to build an additional blast furnace to make large beams, steel rails, and other products; that plans and arrangements were completed for the erection and building of them; that the corporation was using the money procured from plaintiff and others for such purpose; that a sufficient amount of money was assured for the completion of such furnace and for other necessary enlargements and developments, and that the moneys so necessary and so assured amounted to $3,000,000; that the company had fully complied with all the rules and regulations of the securities commission of the state of Utah and with the provisions of law relating to the subject and had obtained the necessary certificate of authorization from the commission to sell its stock.

It is further alleged that the plaintiff, relying upon such representations, on December 16, 1921, purchased 12 shares of preferred stock of the company at its par value of $100 per share and 12 shares of common stock having no par value, and paid therefor $1,000 in December, 1921, and $200 January 5, 1922; that the alleged representations were false, but that he had no knowledge or notice thereof until shortly after the appointment of a receiver in July, 1922, and, on learning of the falsity of such representations, he served notice of rescission on the officers and directors of the corporation and also on the receiver, tendered back the stock

purchased by him, demanded a return of the money paid by him, filed a verified claim with the receiver demanding payment in the sum of $1,200, but the receiver rejected the claim and disallowed it, whereupon the plaintiff, on application to the court, was granted leave to bring this action against the receiver.

It is further alleged that the creditors of the corporation would not be injured by the repayment of such moneys by the receiver, for that, as alleged, the creditors had not incurred any obligations relying upon such stock subscription or purchase, and that practically all of the creditors' claims against the company were as large, and in instances larger, when the stock was sold to plaintiff, as when the receiver was appointed; and that the moneys received by the corporation from sales of its stock were distributed among the creditors of the company and used to reduce their claims and the indebtedness owed by the company at the time of the sale of the stock to the plaintiff.

It is alleged also that the corporation was not able to go ahead and build the additional blast furnace or buildings or make the improvements as represented; that no plans or arrangements were completed or made therefor, and that none of the moneys derived from the sales of stock was set aside for such purpose; that the corporation at and during such stock selling campaign was in bad financial condition and was not able to meet its obligations; that it realized over $100,000 from such sales of stock, but the moneys derived therefrom were seized and paid over to its creditors; that soon after the purchase of the stock by plaintiff the creditors of the company became insistent and demanded payment of their claims, but the company was unable to pay them, and in July, 1922, it admitted an indebtedness of about $600,000 and consented to the appointment of a receiver, but that the obligations which it then had were almost entirely incurred prior to the sale of the stock to plaintiff; that the corporation at the time of plaintiff's purchase of the stock was insolvent and financially unable to pay its

debts or obligations, and prior thereto, and during all of the time of the "said stock drive," was in immediate danger of insolvency and bankruptcy, and was not operating at a profit or increasing its capital or assets as represented.

The plaintiff thus prayed for judgment against defendants in the sum of $1,200; that the receiver be required to recognize the claim as a valid claim against the assets in his hands; that the purchase agreement be canceled; and for other and general relief. The corporation answering the complaint denied all the material allegations of misrepresentations and fraud, and that the plaintiff in purchasing his stock relied on any of them. The receiver answered, making the same denials; and, as an affirmative defense, he alleged that, subsequent to plaintiff's subscription or purchase of stock and payment thereof, a large number of creditors of the corporation advanced credit to it upon the faith of plaintiff's and of other stock subscriptions subscribed about the same time, and upon such reliance permitted the corporation to become indebted to them in amounts in excess of $100,000, in addition to debts already incurred, and which additional indebtedness was incurred prior to any attempted rescission by plaintiff, and therefore he was estopped from rescinding and canceling his stock subscription "as against said creditors." No other estoppel nor laches on the part of plaintiff was pleaded by either defendant.

The case was tried to the court without a jury. At the conclusion of plaintiff's evidence, the defendants interposed a joint motion for a nonsuit upon ground of insufficiency of evidence to support any of the alleged material misrepresentations, or that the corporation had made any false representation as to any material fact, or that the plaintiff relied upon any of the alleged representations of fraud, or that he thereby was induced to purchase the stock; that there was "no evidence" to show that the plaintiff had acted promptly in attempting to rescind the stock subscription or to show that he "had not been guilty of unreasonable delay and laches in repudiating the contract after the discovery

of the alleged fraud," and that there was "no clear nor decisive proof" that the plaintiff had acted promptly in attempting to rescind his stock subscription, or that he had not been guilty of unreasonable delay or laches in repudiating the contract after discovery of the alleged fraud, and that the evidence affirmatively showed that the plaintiff had not proceeded with diligence after discovery of the facts; that there was "no evidence" to show that the plaintiff had acted with reasonable diligence after discovery of facts which would have put a person of ordinary prudence upon inquiry; that the corporation was insolvent, Burke appointed its receiver, and that the assets of the company were required to be applied to the payment of outstanding debts before anything remaining could be paid to stockholders; that the status of the creditors and of the stockholders became fixed when the receiver was appointed, and that the stockholders who were such at the time of the appointment could not thereafter rescind and participate as creditors in the distribution of the assets; that there were creditors who became such after the plaintiff became a stockholder, and that the claims of such creditors in the aggregate were larger than the amount paid by plaintiff for his stock; that, by reason of the insolvency of the corporation, the appointment of the receiver, and of such subsequent creditors, the plaintiff was estopped from rescinding his stock subscription and from recovering back moneys paid by him; that the plaintiff was negligent in failing to inform himself of the actual facts, and, in consequence of his apparent relation with the corporation as a stockholder, subsequent creditors who acquired rights upon the faith of such relation would be prejudiced if the plaintiff be permitted to rescind and to recover back moneys paid by him.

In granting the motion, the court stated that the record showed that creditors' claims amounting to about $80,000 "accrued against the corporation between the time of plaintiff's stock subscription and the appointment of the receiver," and for such reason the plaintiff was "foreclosed

from rescinding his stock subscription and becoming a creditor of the corporation," and, such "being the view of the court, it is unnecessary to consider whether the representations made to the plaintiff to induce him to purchase the stock were of such character as to render the transaction void, nor is it necessary to consider whether or not the plaintiff was guilty of laches in respect to discovering the alleged fraud and presenting his claim for liquidation." The motion accordingly was granted, and the action dismissed, from which judgment of dismissal the plaintiff has prosecuted this appeal.

This being a case in equity, and tried to the court, it would have been much more satisfactory had the court tried the case on the merits and made findings and a decree, instead of disposing of it as was done. We say this because, as will presently be seen, the real question presented on this appeal and the law applicable thereto are dependent upon the facts. We are not now called upon to try the case de novo on the record before us, or to make or direct findings. All that we can now do is to review the record and ascertain whether there is any substantial evidence to support sufficient of the material allegations of the complaint to entitle the plaintiff to recover, and whether on the record it is conclusively shown that he was guilty of laches or because of the pleaded estoppel was precluded from recovery. In reaching a conclusion on the matter, we are required to look at the evidence and all the reasonable inferences deducible therefrom in a light most favorable to the plaintiff. Though the case is one of equitable cognizance, yet if, when the plaintiff rested, there was no substantial evidence to support sufficient of the material allegations to entitle him to recover, or if the evidence conclusively showed him guilty of laches or that he was estopped from recovering anything, it was the duty of the court to grant the motion. But we have here a situation where the court in effect assumed the sufficiency of the evidence to support the allegations of the complaint,

at least sufficient to ward off the motion and to entitle the plaintiff to an adjudication on merits, and where the court further assumed that the evidence did not show plaintiff guilty of laches, or at least did not so conclusively show him guilty as to send him out of court on that ground, but dismissed the case on the ground of claims of creditors accruing after the purchase of the stock by plaintiff and before the appointment of the receiver, dismissed his action, not because of a want of equity as presented by his complaint, but because of the pleaded estoppel by the receiver. Though the court erred in granting the motion on the particular ground on which it was granted, still, if it ought to have been granted on one or more of the other grounds stated in the motion, the ruling nevertheless must be upheld.

Looking at the evidence in the light most favorable to the plaintiff, we think it sufficient to entitle plaintiff to an adjudication on merits. We do not now say what kind of findings respecting such issues ought to be made on the record. The determination of such a question is not now before us. All we can now determine, and all that we do determine, is that the evidence is sufficient to ward off a motion for nonsuit and to entitle the plaintiff to an adjudication on merits.

It is argued that the plaintiff was required to prove his case by clear and convincing evidence. That is true to entitle him to an adjudication in his favor on the merits, but not to overcome a motion for nonsuit. Whether evidence is clear and convincing requires weighing, comparing, testing, and judging its worth when considered in connection with all the facts and circumstances in evidence. On the motion, the trial court could not, nor can we, do that. There is a marked distinction between looking at evidence in a light most favorable to a plaintiff for purposes of a nonsuit, and considering, weighing, and judging it for purposes of findings. Situations may well arise where evidence is sufficient to require the overruling of a motion for non-

suit, but, when weighed and considered for purposes of findings, may not preponderate in favor of the plaintiff.

It is unnecessary to point out the evidence in detail which we think is sufficient to support the material allegations of the complaint. Upon an examination of the record we find sufficient evidence to show that the defendant company, just before entering upon its stock-selling campaign, by reports and pamphlets published and circulated by it, and by advertisements and otherwise, falsely represented that it then was on a sound financial basis and in a prosperous condition; that it, from an original investment of $175,000, out of profits through operations, had increased the investment and capital to about $2,000,000 in addition to payment of dividends on its preferred stock; that its plant was in successful operation, and that the company had increased its plant investment 1,000 per cent out of earnings and had a surplus of $776,886.98; that it had lands of the value of over $76,000, buildings and improvements of over $454,000, machinery and tools of over $1,065,000, working and trading assets of over $313,000, current assets of bills and accounts receivable, cash, etc., of $53,093.48, automobiles and trucks of $20,-318.81, construction work of $76,685.11, and other assets consisting of furniture, fixtures, patterns, etc., of about $12,-000, or total assets of $2,070,898.61, with a stock liability of only $651,400, current liabilities of only $367,466.10, accruals, consisting of pay rolls, taxes, insurance, etc., of $20,-531.23, and reserves of $254,614.30, or a total liability of about $1,294,011 and a surplus of $776,886.98; that it had a plant of present capacity of 6,000 tons per month, and that plans were under way and the company had undertaken to enlarge its mills, furnaces, etc., at a cost of about $3,000,-000 to increase the capacity to 25,000 tons per month, which, as represented, was "less than 10 per cent of the actual consumption of steel products in the market that awaits our ability to meet its needs," and that it was assured that the company would have a steel manufacturing plant

with a capacity of $12,000,000 worth of products a year, and that it had purchased 10,000,000 tons of high grade ore, and had an advantageous purchasing agreement with a fuel company for coke at a low cost. Other false representations were made, as shown by plaintiff's evidence, that the company was out of debt and able to meet all its obligations, and that the moneys received from its stock sales were being set aside and applied to enlarging the plant, that large amounts of stock had been sold to well-known business men, naming them, and that about all of the $3,000,000 worth of stock to be sold had been sold, and sufficient funds from such sales assured to enlarge the plant as contemplated, and that material was on the ground to construct a railroad to the ore deposits.

The company's stock-selling campaign was carried on between the fall of 1921 and January or February, 1922, during which time it sold about $135,000 worth of stock, or about 1,350 shares at $100 a share. Some of the stock was sold for cash and some on future payments. How much was sold for cash and paid for and how much on future payments is not disclosed by the record. None of the money received by the company on such stock sales was used or set aside to enlarge the plant or for the purchase of any material for such purpose; nor was the plant enlarged or any material purchased or work done for such purpose; nor was sufficient stock sold or money obtained to enlarge the plant as contemplated and represented.

In July, 1922, the company confessed its insolvency and an indebtedness between about $400,000 and $600,000, its inability to pay it, and consented to the appointment of a receiver. On the record it is inferable that the company was insolvent when it entered upon its stock-selling campaign and was insolvent all the time thereafter.

Evidence was given to show that the plaintiff, in purchasing the stock, relied on the representations made by the company, and that he did not discover that any of them were false until he learned of the appointment of the receiver

about two weeks after the receiver was appointed; that until then he had no knowledge or notice of the true condition of the company or that any of the representations were false; that he did not participate in any stockholders' or other meetings of the company nor otherwise in any of its affairs, transactions, or proceedings; that he had no knowledge of and was unfamiliar with the business, and had not visited the operations of the plant; that he had received no dividends or other benefits, and resided in a county other than the county where the plant was located and the business affairs of the company conducted.

In April or May, 1922, in connection with other matters, the plaintiff met one of the active officers of the company and asked him why the company was not enlarging the plant and going on with it, to which the officer replied that the company did not want to spend the money until it could get proper freight rates and was holding it until such rates were obtained, when the company would go on and enlarge the plant.

As soon as the plaintiff learned of the appointment of the receiver, he consulted his attorney and placed the matter in his hands to look after it for him, and, as soon as it could be looked into, written notice of rescission was served on the receiver and on the company, the stock tendered back by plaintiff and payment demanded of the moneys paid by him.

As is seen, among other representations, the company, just before it entered upon its stock-selling campaign, in its general balance sheet, financial and other reports, put out and circulated by it, represented that it had a "surplus" of $776,886.98. This, among other representations, was claimed by plaintiff to be false, misleading, and deceiving. The plaintiff gave evidence to show that by such a statement of "surplus" the meaning conveyed and intended to be conveyed was that such was the amount which the company had left out of earnings over and above expenses and paid dividends;

that the company had no such or any surplus or earnings, and that its then unpaid current liabilities, consisting of bills and accounts payable, pay rolls, taxes, insurance, etc., amounted to over $367,000, and that its bills and accounts receivable, etc., to only about $53,000, and cash on hand and in bank to only about $500. It further was shown that the represented surplus was made up, not of earnings or profits from operations or from the business, but by increasing land values 85 per cent, buildings and improvements 81 per cent, machinery and tools 84 per cent, furniture and fixtures 82 per cent, and by canceling or striking off its common-stock liability of $1,131,400 and thereby reducing its liabilities to such an extent, and, after having so increased such values of assets and so reduced its common-stock liability, the company then took the difference between the total assets so increased and the liabilities so reduced, which amounted to $776,886.98, and called that "surplus." But, notwithstanding such increased values of assets and reduction of liabilities, the company still had unpaid current liabilities of over $367,000, consisting of bills and accounts payable, pay rolls, taxes, insurance, etc., and no available funds with which to pay them.

On cross-examination of plaintiff's witnesses, the defendants attempted to show that the term "surplus" not only means, as contended by plaintiff's witnesses, accumulations out of earnings, and that which is left over and above payment of expenses, dividends, etc.—undivided profits from earnings—but that it also means increases created from revaluation of assets, sale of assets above book values, sale of securities above par, and inheritances from previously absorbed corporations. The witnesses admitted the term "surplus" had various meanings, but testified that the common and generally understood meaning was, and the most important source of surplus consisted of, savings out of earnings, and that such a meaning more fairly and accurately showed the real prosperity and solidity of the business; that creating a surplus by an upward revaluation of perman-

ent and unsold assets of a company was generally con-
demned as being a fictitious showing of profits and was
liable to inflation, and that, when a surplus was at all per-
missable by creating or increasing valuations of assets such
surplus ought to be merged with the real gains legally avail-
able for dividends, but should clearly be ear-marked so as not
to misstate the source from which it was created, but which
was not so done by the company; that creating a surplus
from such source was different from creating a surplus from
sales of securities or other assets actually sold and a profit
realized; and that a surplus created by reducing par value
of stock to no par value was "distinctly improper" because
treating or regarding invested capital as surplus.

From the manner in which the item "surplus" was ex-
hibited and represented by the company in its published re-
ports and otherwise, and when considered in connection with
other statements and reports put out and circulated by the
company—that, in addition to the payment of regular divi-
dends the company had "increased its plant investment 1,000
per cent out of its own earnings," from $175,000 to about
$2,000,000—it fairly is inferable that by the terms "sur-
plus," as so exhibited, was meant and intended to mean sav-
ings out of earnings over and above expenses, current debts,
or current liabilities and payment of dividends, just what
the witnesses testified to ordinarily was implied and meant
by the use of the term as exihibted by the company.

We do not now say that creating a surplus, or classifying it
as such, from an upward revaluation of unsold assets or by
reducing par value stock to no par value is in all cases im-
proper, especially when the source of such a surplus is fairly
indicated on the face of the report or statement. What we
do say is that, upon the record, it is inferable that the com-
pany exhibited a surplus of over $776,000 as having been
created out of earnings or profits over and above expenses,
etc., and after payment of dividends, and that, on the record,
it is further inferable that such a representation was untrue
and misleading and was well calculated to mislead and de-

ceive a subscriber or purchaser of the corporation's capital stock.

As heretofore observed, there also was sufficient evidence to support other allegations of misrepresentations; but, as a new trial must be ordered regardless of it, it is unnecessary to further refer to it.

Upon the question of laches, we think the evidence was not of such character as to preclude the plaintiff        7 from recovery.  Indeed, on the record, we think the evidence is not sufficient to even justify a finding that the plaintiff was guilty of laches, much less that he was conclusively guilty thereof.  There is evidence to show that some of the alleged material representations were made, that they were false, that the plaintiff relied on them, and that he did not discover their falsity until after the appointment of the receiver, and that in no particular was he connected with or participated in any of the affairs of the company or attended any stockholders' or other meetings of the company, or otherwise took part in any of the proceedings of the company, or had any knowledge of or familiarity with the business, or received any dividends or other benefits whatsoever, or that he was negligent in not earlier discovering the alleged fraud or misrepresentations.  Nor on the record can we say as matter of law that the plaintiff, after discovering the fraud, did not act with reasonable diligence and promptness in rescinding or repudiating his contract of purchase.  About the only evidence pointed to to show that plaintiff was guilty of laches is that, after he purchased the stock in December, 1921, and in January, 1922, he, in April or May, 1922, met one of the officers of the company, inquired of him why the company was not going on and enlarging the plant, and was told that the moneys were being held for better freight rates, and that as soon as they were obtained the building and enlargement would go on.  It is inferable that the reply so made was made to satisfy the plaintiff, and that it had such effect.  Thus, by what was said, instead of arousing the suspicions of the

plaintiff, it had the tendency to allay them. To entitle the plaintiff to rescind, he, of course, was required to act promptly after knowledge of facts which put him, or ought to have put him, on inquiry. The law is well settled that a person cannot rescind a contract for the purchase or sale of stock for fraud either at law or in equity if he has been guilty of laches or of unreasonable delay, either in discovering the fraud, or in repudiating the contract after its discovery, and, if there are facts which ought to put a person of ordinary prudence on inquiry, the purchaser will be charged with such knowledge as would have been obtained upon such inquiry. But laches cannot be imputed to one who was ignorant of the facts and for that reason failed to assert his rights, and on such ground, to bar relief against fraud, laches must not only consist of delay but of a delay which worked a disadvantage to the opposing party. 6 *Fletcher's Corps.* § 3881. Ordinarily, whether laches exists is dependent upon the particular facts and circumstances of the case. While delay is an important factor, yet mere delay, unless unreasonable or inexcusable, is not enough; and of equal importance are the circumstances occurring during the delay, the relation of the parties to the subject, disadvantages that may have come through loss of evidence, change of title, intervention of equities, or injury from other causes. *Coosaw Min. Co.* v. *Carolina Min. Co.* (C. C.) 75 F. 860; *Du Bois* v. *Clark,* 55 P. 750, 12 Colo. App. 220; *Chase* v. *Chase,* 37 A. 804, 20 R. I. 202; *Parker* v. *Bethel Hotel Co.,* 32 S. W. 209, 96 Tenn. 252, 31 L. R. A. 706; *Galliher* v. *Caldwell,* 12 S. Ct. 873, 145 U. S. 368, 36 L. Ed. 738; *Hamilton* v. *Dooly,* 49 P. 769, 5 Utah, 280; *Hall* v. *Otterson,* 28 A. 907, 52 N. J. Eq. 522. We think the question here was one of fact and ought not to have been disposed of on motion for nonsuit. Neither ratification nor waiver was pleaded, and neither on the face of plaintiff's evidence nor on the record is ratification or waiver made to appear.

It, however, is chiefly contended by respondents that the

nonsuit was properly granted on the ground that, when the rescission was made, a corporate indebtedness of the company of about $82,000 had been incurred between the time of plaintiff's purchase and the appointment of the receiver. The plaintiff did not serve notice of recission until after the appointment, but it also is true that he had not discovered the alleged fraud or falsity of any of the alleged representations or the true condition of the company as it existed at the time of his purchase until after the appointment of the receiver. Nor do we think, on the record, that he was guilty of negligence in not earlier making such discovery; and, as we have indicated, neither do we find on the record that he conclusively was guilty of laches in rescinding or repudiating the contract. Whether one on the ground of fraud or misrepresentation may rescind or repudiate a stock subscription or purchase after the corporation has become insolvent or after the appointment of a receiver, judicial opinions are in irreconcilable conflict. We, however, believe the weight of American authority to be that a rescission or repudiation on such ground may be made after the corporation has become insolvent or the appointment of a receiver, if the person making it was not guilty of laches, and acted promptly and with reasonable diligence, and otherwise was entitled to rescind or repudiate. The difficult question is: May he do so when a considerable amount of indebtedness has been incurred by the corporation subsequent to the stock subscription or purchase and before the insolvency of the company or the appointment of the receiver? The authorities as to this also are in conflict. In support of the contention that he had the right to rescind after the insolvency of the company and the appointment of the receiver, the appellant among other authorities and cases, cites 14 C. J. 599, 600; 7 R. C. L. 241; notes to *Gress* v. *Knight,* 31 L. R. A. (N. S.) 900; notes to *Morrisey* v. *Williams,* L. R. A. 1915D, 792; *Marion Trust Co., etc.,* v. *Blish,* 84 N. E. 814, 85 N. E. 344, 170 Ind. 686, 18 L. R. A. (N. S.) 347, and notes; *Stone* v. *Walker,* 77 So. 554, 201 Ala. 130, L. R. A. 1918C, 839; *Green* v. *Stone,* 87

So. 862, 205 Ala. 381; *Independent Van & S. Co.* v. *Iowa Merc. Co.*, 168 N. W. 782, 184 Iowa, 154; *Atwood* v. *McKenzie-Waterhouse Co.*, 206 P. 978, 120 Wash. 214; *Steele* v. *Singletary*, 110 S. E. 833, 120 S. C. 132; *Haskell* v. *Gardner*, 93 N. E. 458, 50 Ind. App. 1; *Latulippe* v. *New England Inv. Co.*, 86 A. 361, 77 N. H. 31; *People* v. *California Safe Deposit & Trust Co.*, 126 P. 516, 520, 19 Cal. App. 414; *Johns* v. *Coffee*, 133 P. 4, 74 Wash. 189; *Harn* v. *Smith*, 204 P. 642, 85 Okl. 137; *Smith* v. *Johnson*, 49 N. E. 694, 57 Ohio St. 486.

The authorities cited by respondents on this subject are 1 Thompson, Corps. (8th Ed.) § 737; 1 Cook, Corps. (8th Ed.) § 164; Morawetz, Corp. § 108; 2 Black, Rescission, § 352; Jones, Insolvent and Failing Corps. § 399; 14 C. J. §§ 870 and 872; Purdy's Beach on Insolvent Corps. § 628; *Wallace* v. *Bacon*, (C. C.) 86 F. 553; *Tillinghast* v. *Bailey*, (C. C.) 86 F. 46; *Henderson* v. *Crosby*, 194 N. W. 641, 156 Minn. 323; *Lantry* v. *Wallace*, 97 F. 865, 38 C. C. A. 510; *Meholin* v. *Carlson*, 107 P. 755, 17 Idaho, 742, 134 Am. St. Rep. 286; *Bartlett* v. *Stephens*, 163 N. W. 288, 137 Minn. 213; *Scott* v. *Deweese*, 21 S. Ct. 585, 181 U. S. 202, 45 L. Ed. 822; *Morgan* v. *Ruble*, 160 P. 543, 81 Or. 641; *Scott* v. *Abbott*, 160 F. 573, 87 C. C. A. 475; *Howard* v. *Glenn*, 11 S. E. 610, 85 Ga. 238, 21 Am. St. Rep. 156; *Gress* v. *Knight*, supra; *Roe* v. *Oradell Farms Co.*, 96 A. 65, 85 N. J. Eq. 146; *Bank of North America* v. *Pennsylvania Oil Ref. Co.*, (D. C.) 216 F. 377; *William B. Joyce & Co.* v. *Eifert*, 105 N. E. 59, 56 Ind. App. 190; *Empire Life Ins. Co.* v. *Brown*, 89 S. E. 1085, 145 Ga. 818; *Niemeyer* v. *Dougan*, 119 S. E. 544, 31 Ga. App. 99; *Dunn* v. *State Bank*, 61 N. W. 27, 59 Minn. 221; *Davis* v. *Burns* (Tex. Civ. App.) 173 S. W. 476; *Atwater* v. *Stromberg*, 77 N. W. 963, 75 Minn. 277; *Marion Trust Co.* v. *Blish*, supra; *Dunffield* v. *Barnum Wire & I. W.*, 31 N. W. 310, 64 Mich. 293; *Olson* v. *State Bank*, 69 N. W. 904, 67 Minn. 267; *Van Gilder* v. *Eagleson*, 181 P. 539, 66 Colo. 364; *Preston* v. *Jeffers*, 200 S. W. 654, 179 Ky. 384; *Newton Nat. Bank* v. *Newbegin*, 74 F. 135, 20 C. C. A. 339, 33 L. R. A. 727; *Hinkley* v.

*Sac. Oil Co.,* 107 N. W. 629, 132 Iowa, 396, 119 Am. St. Rep. 564; *Wilcox Trux, Inc.,* v. *Rosenberger,* 195 N. W. 489, 156 Minn. 487.

Some of the cases cited may readily enough be distinguished without clashing; some not.

In notes to *Marion Trust Co.* v. *Blish,* supra, at page 347, it is said:

"There is some conflict among the decisions as to the right of a subscriber of corporate stock, when sued by the receiver of an insolvent corporation, to interpose a defense which would have been available to him had the corporation itself sought to enforce such subscription— one line of decisions holding such defense to be permissible on the ground that the receiver stands in the shoes of the corporation and possesses no greater right than the corporation; while other cases deny such right on the ground that the receivers represent corporate creditors whose rights are superior to those of the corporation. Still other cases base their denial on the ground of estoppel."

In notes to *Gress* v. *Knight,* supra, at page 900, it also is said:

"While the established rule in England seems to be that all relief from subscription to stock upon the ground of fraud is cut off by the insolvency of the corporation, the great weight of American authority has proceeded upon the principle that to entitle a subscriber to relief, after the insolvency of the corporation and the consequent intervention of the rights of creditors, upon the ground that his subscription was induced by false and fraudulent representations, he must have acted promptly, and with reasonable diligence repudiated his contract upon discovering the fraud, and not have permitted himself to do any acts inconsistent with an intention to repudiate, such as receiving dividends or taking part in the proceedings of the corporation; otherwise he will not be able to escape his liability as a stockholder."

*Newton Nat. Bank* v. *Newbegin,* supra, is a case cited by the annotator as a leading case on the subject. In that case the court said:

"If a considerable period of time has elapsed since the subscription was made; if the subscriber has actively participated in the management of the affairs of the corporation; if there has been any want of

diligence on the part of the stockholder, either in discovering the alleged fraud, or in taking steps to rescind when the fraud was discovered; and, above all, if any considerable amount of corporate indebtedness has been created since the subscription was made, which is outstanding and unpaid— in all of these cases the right to rescind should be denied, where the attempt is not made until the corporation becomes insolvent. But, if none of these conditions exist, and the proof of the alleged fraud is clear, we think that a stockholder should be permitted to rescind his subscription as well after as before the company ceases to be a going concern."

It will be seen that in some of the cases relief was denied on the theory of the "trust fund doctrine," by reason of which it is asserted that the equities of creditors are superior to those of a defrauded shareholder. But, in a note, 14 C. L. 601, it is stated that, in case of rescission for fraud or misrepresentation, though the rescission was made after the insolvency of the corporation and against the receiver, the trust fund doctrine has no application. The doctrine in this jurisdiction, as well as in some other jurisdictions, when applied to insolvent corporations and companies, has been repudiated. *Callahan* v. *Pioneer Nurseries Co.*, 164 P. 878, 49 Utah, 541, 19 A. L. R. 1082; *Passow & Sons* v. *Wetherbee*, 167 P. 350, 50 Utah, 243. Such undoubtedly is the correct rule as to all existing creditors and as to all indebtedness incurred by the corporation prior to the subscription of stock. *Atwood* v. *McKenzie-Waterhouse Co.*, supra. In no sense may it be said that such creditors relied on the stock subscription or purchase. In such particular the receiver stands merely in the shoes of the corporation and whatever defense the defrauded stockholder had against the corporation he also has against the receiver, though the rescission or repudiation was not made until after the insolvency of the corporation or the appointment of the receiver.

As to subsequent creditors, we, upon what we regard to be the weight of authority, deduce this: Where one subscribed for or purchased stock of a solvent corporation, he, on the ground of fraud, or misrepresentation, may rescind or repudiate the contract, if other-

wise entitled to do so, and is not guilty of laches, even after the corporation has become insolvent or has gone into hands of a receiver, except as to subsequent creditors, who, in ignorance of the fraud and on strength of or reliance on the stock subscription or purchase in good faith and in some considerable amount, became such thereafter and before the insolvency of the company or appointment of the receiver, to show which the burden is on the receiver or such subsequent creditors.

In such view, looking at the evidence in the light most favorable to the plaintiff, we find this to be the situation; When the stock was purchased by plaintiff, the company then had current liabilities of about $368,000 and numerous creditors, about 150 of whom were creditors on open and running accounts. Such creditors, after plaintiff's purchase of stock, continued as they had before to carry on an open running account with the company until or shortly before the appointment of the receiver. It is claimed by the respondents that between such time the aggregate amount of corporate debts incurred with such creditors was about $82,000. But in about every instance the company, at the time of plaintiff's purchase of stock, was indebted to such creditors as much as, and, in some instances, more than, when the receiver was appointed. To illustrate this, we refer to but a few instances. At the time of plaintiff's purchase the company, on an open and running account, was indebted to a fuel company in the sum of $24,469.01. The open and running account was carried on and continued after plaintiff's purchase as it was carried on before. When the receiver was appointed, the company owed the fuel company $14,933, of which only $2,635.75 was contracted after plaintiff's purchase of stock and before the appointment of the receiver. Thus, the claim is made that such amount of $2,635.75 was a corporate indebtedness, incurred by the company on the strength of or reliance on plaintiff's purchase of stock. At the time of his purchase, the company, on an open and running account, was indebted to a fire clay com-

pany in the sum of $12,131.31, and in September prior thereto in the sum of $14,623.37; but when the receiver was appointed the indebtedness was only $9,804.98, of which $2,076.45 was contracted between the time of plaintiff's purchase of stock and the appointment of the receiver. Again such last-named account is claimed to be a corporate indebtedness incurred on reliance of plaintiff's purchase. In some instances obligations of the company were incurred prior to plaintiff's purchase and notes in payment thereof given subsequent thereto, which notes also are claimed to be corporate indebtedness incurred on reliance of plaintiff's purchase—and, when we say on reliance of plaintiff's purchase, we of course mean on reliance of his stock subscription or purchase as well as on subscriptions or purchases of stock by others at about the same time and during the stock-selling campaign. Unpaid salary of over $5,000, earned between the time of plaintiff's purchase of stock and the appointment of the receiver, and due and owing one of the active managing officials of the company, also is claimed to be a corporate indebtedness of the company incurred on reliance of plaintiff's purchase. Surely a managing officer of the company, participating in proceedings and affairs of the company out of which the alleged fraud arose or in connection with which it was practiced, has no equities superior to those of such a defrauded shareholder. He ought to be well content if permitted to share on an equal basis with such a shareholder, and could not well complain if he were subordinated to the rights and claims of such a shareholder. Thus, in such manner, with the exception of comparatively a few thousand dollars, were corporate debts created in the aggregate of about $82,000 subsequent to plaintiff's purchase of stock and before the appointment of the receiver. The company, during its campaign of stock-selling, having generally circulated by published reports and advertisements that moneys obtained from sales of its stock would be set aside and applied to improving and enlarging its plant, had a creditor or creditors in pursuance

thereof sold and delivered to the company on credit materials and supplies for such purpose, or engaged in construction of such work, an inference or presumption might well be indulged that such a debt or debts were incurred and given credit on reliance of such stock subscriptions or purchases. But no such indebtedness was incurred.

Independent of other evidence, or other facts or circumstances, it is rare where, from the mere fact of a stock subscription or purchase and the incurring of corporate indebtedness thereafter, a conclusive presumption may be indulged that such debt or debts were incurred on reliance of stock subscription or purchase. To give a subsequent creditor equities over a defrauded stockholder, it is not essential that it be shown by direct evidence that the creditor or creditors relied on the stock subscription or purchase; but, to justify such reliance, there ought to be shown some facts or circumstances in addition to the mere fact that a substantial amount of debt was incurred or credit given subsequent to the stock subscription or purchase. There were no new creditors; but that is not controlling. An old creditor on reliance of stock subscriptions or purchases may, subsequent thereto, extend further or additional credit just as a new creditor may on such reliance extend credit. There may be here some subsequent creditors who have equities superior to those of the plaintiff, but on the record, and because of the nature and character of the subsequent indebtedness and the manner in which it was incurred, no such conclusive presumption as to any of it should be indulged as was done by the trial court as to all of it, and the plaintiff denied all relief. The difficulty here is that all debts incurred subsequent to plaintiff's stock subscription, no matter what amount or nature or how incurred, including a subscription to Polk's directory, dues owing the Commercial Club, unpaid telegram and ambulance service, unpaid salaries of officers, stationery and supplies furnished on open and running accounts in small amounts by houses dealing with the company since its creation, other debts,

some of them in substantial amounts, many of them in mere small amounts, incurred on open and running accounts subsequent to plaintiff's purchase, were grouped and treated as of equal standing and equity, and the conclusive presumption indulged that all were incurred on strength of and reliance on plaintiff's and other stock subscriptions and purchase, and all such creditors treated as having equities superior to those of plaintiff, who was sent out of court and his action dismissed—dismissed not only as to subsequent creditors, but also as to all creditors existing at the time of his purchase—and plaintiff forbidden in any particular from participating with them or at all or on any condition in any of the assets of the company, and thereby all claims of prior as well as subsequent creditors adjudged superior to those of the plaintiff, and thus, stripped of all rights in the premises, the court turned him out naked even as against the corporation itself who, as alleged and as shown by evidence, defrauded him. In other words, by the ruling, the trial court made no distinction whatever as to prior or subsequent creditors, and in such respect even exceeded the terms of the pleaded estoppel which declared an estoppel only as to subsequent creditors. However, the ruling in such regard is now defended on the ground that the aggregate amount of subsequent debts incurred greatly exceeded the amount of plaintiff's purchase. But the aggregate amount of subscriptions and purchases during the stock-selling campaign greatly exceeded the aggregate amount of such indebtedness, even though the whole of the $82,000 indebtedness should be regarded as corporate indebtedness incurred on reliance of such stock subscriptions or purchases, which, on the record, is not justified.

Having adopted that line of decisions and authorities which generally speaking, hold that the receiver of an insolvent and non-going corporation takes the property of the company for the creditors subject to such liens and equities as exist against the property at the time of his appointment, and that, unless his powers are enlarged by statute he suc-

ceeds to no right of action which the corporation itself did not possess, and that any defense which would have been good against the corporation may be asserted against the receiver (*Harn* v. *Smith*, 204 P. 647, 85 Okl. 137, and cases and authorities there cited), except as to subsequent creditors on rescission of stock subscriptions and purchase on the ground of fraud and misrepresentation and as hereinbefore indicated, the further question arises: How, by whom, when and where are the equities of such subsequent creditors to be presented?

In 6 Fletcher, Corps. § 4116, the author says:

"* * * It has been held that a receiver cannot represent creditors whose rights rest on the ground of estoppel, since their interests are opposed to his, and hence that he cannot enforce, for the benefit of subsequent creditors, subscriptions obtained through fraud, or recover the difference between the price paid for stock at a discount and its par value for the benefit of persons who extend credit to the corporation on the faith of the full capital stock being paid in. It has been held that, in the collection of subscriptions, the receiver represents the entire body of creditors; that it is his duty to maintain their rights as a whole, and to be indifferent as between various sets of creditors; and that 'his claim must be founded on the theory that the subscription belonged to the corporation, and therefore is a part of the general assets.' And on this theory it has been held that he cannot base a recovery on the right of a particular class of creditors only to enforce a subscription which the corporation could not have enforced, and the proceeds of which would inure to the benefit of that class of creditors alone. On the other hand, it has been held that a trustee in bankruptcy represents the bankrupt and all its creditors, and is not prevented from acting because those interests are conflicting. So it is no defense to an action by him to collect unpaid subscriptions that some of the creditors have waived, or estopped themselves to assert, the right to resort to the liability of the stockholders, where there are other creditors who have not done so. The fact that all of the creditors are not entitled to participate in the fund will not prevent him from reducing it to possession, for the benefit of those creditors who are entitled to share in it, since he represents all the creditors, and is therefore the representative of each."

In support of the first proposition, the author chiefly cites *Marion Trust Co.* v. *Blish*, 84 N. E. 814, 85 N. E. 344, 170 Ind. 686, 18 L. R. A. (N. S.) 347, and *Reel* v. *Brammer*,

101 N. E. 1043, 56 Ind. App. 180. In support of the second he cites *Babbitt* v. *Read,* (C. C.) 173 F. 712, and *Grand Rapids Trust Co.* v. *Nichols,* 165 N. W. 667, 199 Mich. 126.

Substantially all the authorities agree that, in an action brought by a defrauded stockholder to rescind his stock subscription or purchase, the equities of subsequent creditors is matter of defense and must be pleaded. It here was pleaded by the receiver. But *Marion Trust Co.* v. *Blish,* supra, is authority to the effect that the receiver may not do that. It there, in substance, is held that, while the receiver represents the entire body of creditors, yet is under duty to be indifferent between various sets of creditors, and is not authorized to maintain an action in which the granting of the relief sought would place creditors having an equity in a worse condition and creditors having no equity in a better condition than they occupied before his appointment; and, if there be rights in a class of creditors which the receiver may not properly represent and other creditors who are without right, the former may vindicate their rights by intervention or in an independent action. However, as pointed out by Fletcher, *Babbitt* v. *Read* and *Grand Rapids Trust Co.* v. *Nichols,* supra, are authorities to the contrary. They rather proceed on the theory that a receiver is an officer of the court and without personal interest representing the corporation and all of its creditors, and, though rights of creditors may be inconsistent or even hostile, yet such does not prevent him from seeking to recover or protect assets of the corporation and reduce them to his possession for the benefit of those entitled to share in them. We are inclined to, and adopt, this view. So our ruling is that the defense of equities of subsequent creditors was properly interposed by the receiver. At the same time we see no reason why such subsequent creditors, if they chose to do so, may not, upon a proper showing, intervene in an action such as here. Though equities of subsequent creditors be, in an action of this kind, determined against him, the plaintiff, nevertheless, on issues as here, was en-

titled to have adjudicated his demand and damage, and if found in his favor, to have declared the amount thereof entitled to participate in the assets of the company upon a basis of equality with existing creditors at the time of his purchase, except as to secured or otherwise preferred creditors. Because on evidence and the record in a case it may be found and determined that equities of subsequent creditors are superior to those of the plaintiff, still, for such reason, existing creditors who, as against the plaintiff having no equity ought not to be placed in a better condition than occupied by them before the appointment of the receiver had there been no subsequent creditors.

Let the judgment of the court below be reversed, the case remanded, and a new trial granted. Such is the order. Costs to the appellant.

GIDEON, C. J., and THURMAN, FRICK, and CHERRY, JJ., concur.